[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 19, 2010
JOHN LEY
CLERK

_____

No. 08-13740

_____

D. C. Docket No. 07-00107-CR-TCB-3-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THERESA L. KOTTWITZ,
GERARD MARCHELLETTA, JR.,
GERARD MARCHELLETTA, SR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(August 19, 2010)

Before EDMONDSON and BIRCH, Circuit Judges, and HODGES,* District
Judge.

_____

* Wm. Terrell Hodges, United States District Judge for the Middle District of Florida,
sitting by designation.

PER CURIAM:

Defendants Theresa L. Kottwitz ["Kottwitz"], Gerard Marchelletta, Sr. ["Senior"], and Gerard Marchelletta, Jr. ["Junior"] appeal their convictions and sentences for tax fraud-related charges. We find the evidence sufficient to support the jury's verdict regarding their conspiracy convictions and that the general good faith jury instruction that was provided by the district court fully encompassed Kottwitz and the Marchellettas' theory of defense on this charge. We find, however, that the district court erred in refusing to give Kottwitz's and the Marchellettas' requested special instruction to the jury on their good faith reliance on their accountant's advice. Because the evidence was sufficient for a properly instructed jury to convict on the charges of filing materially false personal income tax returns for 2000 as to Junior and Senior and for evading taxes as to Senior, we vacate and remand for retrial in light of the jury instruction error. Because the evidence was insufficient for a properly instructed jury to convict on the charge of aiding and assisting in the filing of a materially false corporate tax return for 2001, we reverse the convictions of Kottwitz, Junior, and Senior and remand with directions to enter a judgment of acquittal on this count.

# I. BACKGROUND

Nastasi & Associates ["Nastasi"] is a carpentry union subcontractor in Garden City, New York which installs and finishes drywall. R20 at 438. It was formed by Frank Nastasi ["Frank"] and Senior in 1993, and was owned by Frank and Tom Nastasi, Hughey White, and Senior. In 2002, Nastasi's president was Frank's son, Anthony Nastasi ["Anthony"].[1] Id. at 437, 439-42, 473. At Nastasi, Senior served as the Executive Vice President and was in charge of estimating. Id. at 442. Nastasi owned a majority interest in Circle Industries ["Circle"], a commercial drywall contracting business in Atlanta, Georgia formed by Junior in the early 1990s.[2] R17 at 95; R18 at 224; R20 at 370-71, 474. During the first few years after Circle began working in Atlanta, Circle was often short of cash, including what was necessary for payroll, and regularly obtained loans from Nastasi. Id. at 392, 430, 435, 521.

---

[1] Frank and his brother, Tom Nastasi, established Nastasi Brothers in the 1950s. R20 at 468-69. Senior started working for the Nastasi Brothers while he was in high school, and was eventually promoted to a job estimator in the front office. Id. at 469. In the late 1950s or early 1960s, Nastasi Brothers merged with another subcontractor to form Nastasi White. Id. at 438, 468, 470. Nastasi & White was owned, in part by Frank, Tom, and Senior, and installed drywall work in the World Trade Center. Id. at 471-72.

[2] Junior had worked as an employee of Nastasi predecessor, Nastasi White. R20 at 474; R17 at 95. In 1984, Nastasi White purchased New York's "biggest" drywall business, Circle Industries. R20 at 471-72.

In 1998, Circle was awarded a construction project working on the Atlantis hotel and casino in Nassau, Bahamas. R18 at 224-25, 228. Because Bahamian employment law required that employees working in the Bahamas work for Bahamian companies, Circle organized Circle Industries, Ltd. as a Bahamian company to pay its employees. Id. at 239; R20 at 415.

About the same time, Senior decided that he wanted to retire from Nastasi and move to Atlanta to help Junior run Circle. On 31 December 1998, Senior and Frank entered into a stock swap agreement with the assistance of Nastasi's tax attorney, William Bernard, in which Senior exchanged his interest in Nastasi for the stock held by Nastasi in Circle, and Nastasi agreed to repay a $700,000 loan from Senior.[3] R20 at 444-45, 448-49, 478, 499-521; R27 at 1102-03; Govt. Exhs. 458-60. The stocks transfer was to have been completed prior to 1 January 2000. R26 at 289. At the time of the stock swap agreement, the Nastasi stock was owned 70 percent by Frank and 30 percent by Senior; the Circle stock was owned 80 percent by Nastasi. R20 at 448. Senior's 30 percent share of Nastasi stock was valued at $1,300,000; Nastasi's 80 percent share of Circle stock was valued at $1,050,000. Id. at 502-03; Exh. 473. As part of the consideration, Nastasi agreed to make an additional $250,000 payment to Circle. Id. at 503; Exhs. 456. 473,

---

[3] The stock exchange agreement was also reviewed by Stanley Schleger ["Schleger"], an independent accountant who performed Nastasi's audits. R20 at 499, 524-25.

473.1. The stock exchange was recorded in Nastasi's general ledger. R20 at 501. The $250,000 was wired from Nastasi to Circle on 11 February 1999, and was received and recorded in Circle's operating account where it was co-mingled with other monies in that account. Id. at 501-04; R24 at 198-207; R26 at 280-82. Schleger, who was performing accounting and auditing services for both Nastasi and Circle in 1999, considered the $250,000 transfer a loan and entered it on Nastasi's records as an "advance against cost to affiliate" [Circle] and on Circle's books as an advance from a shareholder [Nastasi]. R20 at 503-04, 505-07, 522-24; R24 at 199-200, 202-03; R26 at 280-82; Govt. Exh. 473.1. The $250,000 was spent from that account by the end of February 1999. R26 at 282-84. After the stock swap, Senior had no ownership interest in Nastasi and owned about a 75 percent interest in Circle; Junior served as President of Circle and owned about 25 percent. R18 at 153; R20 at 500; R26 at 288; Govt. Exhs. 5 at 2, 458-60. Senior devoted 75 percent of his time to Circle, while Junior devoted 100 percent of his time to Circle. Govt. Exh. 5 at 2. For tax year 2000, Circle had approximately $26 million in gross revenue, principally from large commercial projects such as dormitories, hospitals, hotels, nursing homes, and resorts. R18 at 224-25; R20 at 373; Govt. Exh. 5 at 1.

Senior's estimating expertise and the estimating software that he developed were "critical" to Nastasi's business, and he continued to work for Nastasi until he retired in 2000. R20 at 450. While working for Nastasi, Senior's W-2 statements were prepared by the Nastasi bookkeeping department and reviewed by their accountants. Id. at 518. Upon Senior's retirement, he entered into an agreement not to compete with Nastasi for construction work. The agreement also provided that Senior and Circle were employed as advisors and consultants to Nastasi, with payment to Circle, Senior or any company either or both of them owned. By separate agreement, Senior or his designee was guaranteed $1,300,000, to be paid in 213 weekly installments of $6,000 and one $4,000 installment as consulting payments, effective 1 January 2000. Id. at 450-51, 453-57, 508; R26 at 294; R27 at 1102-03; Govt. Exhs. 459, 460. Much of the consultation estimation work took place between the information technology departments of Nastasi and Circle working with Senior's estimating software, which both Nastasi and Circle used. R20 at 451, 458-59. On a weekly basis, Circle sent an invoice to Nastasi for Senior's consulting work, Nastasi paid Circle $6,000, and Circle deposited the $6,000 into its bank account. Id. at 459-62, R24 at 218; Exhs. 461-63, 465.1-.44, 466.1-.42, 467.1-.13. Nastasi recorded the payments as "consulting fees" and Circle recorded them as "other income." R20 at 458-61, 509, 545, 555-60; R22 at

6

163; R24 at 215.  No other checks or monies were posted to the "other income" account.  R20 at 557.  The payments were included on Nastasi & Associates' corporate income tax return, which were audited by the IRS, as consulting fees.  Id. at 510, 530-31.

Kottwitz was employed as a bookkeeper/controller for Nastasi.  Id. at 504.  While at Nastasi, Kottwitz worked with Nastasi's outside accountant, Gary Schwartz ["Schwartz"], while he was working with the Stanley Schleger independent accounting firm[4] and after he had opened his own practice.  Id. at 424-25, 497, 513, 521; R22 at 30-33, 36-38, 156.  Schwartz performed work on the Nastasi tax returns at both the Nastasi and Schleger accounting offices.  Id. at 35.

Kassandra Logan ["Logan"] began working for Circle in 1994 and, beginning in 1995, performed data entry for accounts payable and estimating.  R20 at 370-72.  She learned Circle's Emque accounting program from Kottwitz during a trip to New York and spoke to her on the telephone if she had any questions.  Id. at 370, 374.  Logan explained that, when an invoice for goods or services was received at Circle, it was opened by the receptionist and sent to an accounts payable clerk, who then matched it to a shipping or delivery ticket to insure that the materials had been received, and entered the job name and number and general

_____

    [4] Schleger worked with the Nastasis, in their various businesses, for over 40 years until 2004.  R20 at 498.

7

ledger information onto the invoice.  Id. at 375, 383, 422-23.  Circle received between 50 and 100 invoices each day.  Id. at 423; R26 at 312.  The job name reflected the project and the job number was assigned by year and the historical order of the awarded job.  Id. at 376-377.  The standard job number consisted of five digits:  the first two represented the year that the project began, and the last three were assigned consecutively in chronological job order.  Id.  The accounts payable clerk determined what job and general ledger number to assign to each invoice, entered the invoice data into the Emque program, and filed the invoice into an unpaid invoice file.  R20 at 388-89, 423; R26 at 312-13.  Circle accounts employees made about 2000 entries to the Emque program per month.  Id. at 315.  If journal entries or reclassifications were made on the Circle books, they were done under the instruction of Kottwitz or Schwartz.  R20 at 408-09.  About once a month, an accounts payable report of unpaid invoices was printed and given to Junior for the selection of invoices to be paid.  Id. at 389-90, 423-24.  Junior had signature authority for Circle; Logan and other accounts payable employees had a signature stamp that they frequently used.  Id. at 395-96.  Logan provided copies of the job management ("JM") reports, accounts payables reports, and general ledgers to Schleger and Schwartz, and discussed the general ledger revisions with them.  Id. at 377, 424-25, 431.  The JM reports provided information on a job's overall

cost, the company's profits and losses, the progress of the job, and the percentage of the job that had been completed.  Id. at 377.  The JM reports could show both the active and inactive accounts, and both reports were routinely given to Junior. Id. at 378, 380.

Beginning in 1999, Schwartz was "engaged by Circle to prepare their audited financial statements and the related tax returns."  R22 at 39, 45, 125, 185. His engagement letter provided that he would "reasonably obtain information" from the accounts, and assess whether the accounts were free from material misstatements to insure that each was reconciled and valid.  Id. at 39, 41, 48. Although Schwartz received much of the information for tax return preparation by mail, he also traveled from New York to Atlanta for the audits and spent two and one-half days reviewing Circle's books and records each June from 1999 through 2003.[5]  Id. at 41-43, 45, 84, 89.  When he noticed any mislabeled entries, Schwartz made journal entries and advised Logan, Kottwitz, or Kenya Diggs, an accounts receivable clerk, so that the entries could be correctly labeled.[6]  R20 at 431, 563-

---

[5]  Circle's fiscal year ended on 31 March each year, and Schwartz waited about two and one-half months for the books to close before performing the audit.  R22 at 43.

[6]  Diggs was in charge of Circle's accounts receivable department from October 2001 until December 2004.  R20 at 545.

64, 581-82, 584; R22 at 32, 107, 162.  Schwartz completed the audits at his New York home office.  Id. at 36, 41, 43.

Schwartz conducted Circle's audits for their bonding insurance, and used the audits to prepare Circle's corporate tax return and the Marchellettas' personal tax returns.  Id. at 47, 83-84, 90.  Schwartz explained that it was "quite difficult" to perform the audits of "the company's internal control," but that the audits were done "only to the extent to assess the control risk" and not to "uncover certain types of irregularities."  Id. at 46, 49, 171.  Schwartz testified that no one at Circle limited his time in Atlanta or his audit analysis in any way, and that they provided him with as much time and information as he needed to prepare the audits.  R22 at 47, 60, 154, 161-62.  Schwartz reviewed Circle's general ledgers, payroll and salary schedules, and the JM report.  Id. at 57-58, 60-61, 63-64; Govt. Exh. 431.1.  He also had access to Circle's computer and could run any needed additional reports.  R20 at 424-25; R22 at 146.  He prepared a "work-in-progress" schedule that listed all pending jobs with their actual billings and expenses and compared it to Circle's estimate of the expected profit from that job to determine whether the expenses and the revenues matched.  Id. at 79.

In preparing the audits, Schwartz required that Circle provide "reasonable, rather than absolute, assurance that the financial statements [we]re free of material

10

misstatement, whether caused by error or fraud" and explained that "a material misstatement m[ight] remain undetected." Govt. Exh. 425 at 1. He further explained that "an audit is not designed to detect error or fraud that is immaterial to the financial statements" and that "a material fraud may occur and not be detected." Id. Each tax year, Junior signed a document, prepared by Schwartz, confirming that, to the best of his knowledge and belief, he had given Schwartz all of the relevant documentation and information, including Circle's financial records, related data, and minutes of any stockholder or directors' meetings, that was necessary for Schwartz to audit Circle's books and to prepare Circle's and the Marchellettas' personal income tax returns. Id. at 50-54; 140; Govt. Exh. 427.10. One of the items that Junior agreed to disclose was any "[r]elated party transactions." Govt. Exh. 427.10 at 2. The personal tax returns were due on 15 April each year; the corporate tax return was due on 15 September because Circle operated on a fiscal year that began on 1 April and ended on 31 March. R22 at 90-91; R24 at 106-07.

Schwartz eventually prepared Circle's 31 March 2000 financial statement, its tax returns for 1 April 1999–31 March 2000 and 1 April 2000–31 March 2001, and the Marchellettas' personal tax returns for 1999-2000. R22 at 7, 83-87, 102-03; Govt. Exhs. 1-2, 5, 7.3, 475, 485. In preparing the Marchellettas' personal

11

returns, Schwartz requested extensions for each of them. R22 at 91, 125, 174.

Junior's 2000 tax return reported $145,000 in salary from Circle. Id. at 85-87;

Govt. Exh. 3. Senior's 1999 and 2000 tax returns reflected income from his W-2s,

small capital gains, interest, and a pension.[7] R22 at 100-03. Senior's 2000 tax

return reported $176,000 in salary from Circle but did not include any income from

Nastasi or from the payment of personal expenses by Circle. Id. at 102-03; R24 at

232-34; Govt. Exh. 4. When Schwartz "generated" a tax return, he signed the

original that was sent to the IRS, sent his clients an unsigned copy of the return,

and kept an unsigned copy in his files. R22 at 92-93, 119.

In late 1999 or early 2000, Kottwitz moved to Atlanta to replace Logan as

Circle's accounting manager and controller. R20 at 391, 420, 504, 563. Schwartz

testified that, after he was retained to work with Circle, he spoke to Kottwitz a few

times by telephone and then, after 1999, when he arrived in Atlanta for the audits,

he sat down with Kottwitz to review the documents that had been assembled for

the audits and to advise her regarding what other necessary information needed to

be pulled.[8] R22 at 37, 43, 54-55, 57, 158, 160. Although Kottwitz was "very

---

[7] Senior was a salaried employee of Nastasi in 1999, and a salaried employee of Circle in 2000. R20 at 518; R26 at 295, 306.

[8] In a separate matter, Kottwitz testified that she did not perform audits for Circle and that Circle's audits were handled by "an outside CPA firm." R18 at 309.

busy" in her position as Circle's bookkeeper, comptroller, and office manager, she provided him with "as much information as possible," assisted him in locating other needed information both while he was in Atlanta and after he had returned to New York, and was "there to help."[9] R20 at 583-84; R22 at 32, 43, 56, 73, 156, 159, 161-62, 187. Schwartz did not generally ask Junior or Senior for information, but relied on Kottwitz. Id. at 32. Kottwitz provided Schwartz with the JM Reports, which listed all of Circle's projects including Crabapple and Newport Bay. Id. at 60-61, 63-64. Schwartz did not review every record on each construction job, but had access to the job ledgers for every job and selected certain jobs at random to review. Id. at 59-60, 146. Schwartz commented that Kottwitz was "always" "reclassifying entries" to get them right on the books, and would ask his advice on where to classify an entry. Id. at 98, 162. Senior was aware that Schwartz and Kottwitz worked on the audits together, and that Schwartz relied upon Kottwitz for information and documentation. Id. at 185-86.

Schwartz, who explained that he was unaware of Senior's separation agreement with Nastasi, noticed that Circle's "other income" account had a large

---

[9] Diggs also obtained documents for Schwartz, whom she understood to be Circle's independent CPA and not an employee of Circle. R20 at 563, 583.

balance of around $300,000, and asked Kottwitz about it.[10]  R20 at 101, 103; R22

at 164-65.  Kottwitz explained that "it was income from Nastasi & Associates that

when the two former owners split up the company [Nastasi & Associates], money

was owed to – as commission income to the corporation [Circle]."  Id. at 103; also

see id. at 120-21 (Schwartz explained that "what happened was [the Nastasi

payments] w[ere] first put into income and then [Kottwitz] told me that it was a

return of capital), id. at 164 (Schwartz answered "[c]orrect" when asked whether

Kottwitz had "said that it was her understanding that this money was a result of

negotiations between Senior and . . . Nastasi concerning the split-up"); id. at 165

(Schwarz answered "[c]orrect" when asked whether Kottwitz "was just telling

[Schwartz] what she was told."); id. at 180-81 (Schwartz testified that Kottwitz

explained that the "money owed" to Senior after the company breakup was

deposited into Circle's accounts and "should" have been credited to Senior).

Schwartz asked Kottwitz for "documentation" regarding the income but Kottwitz

did not have the documents.   Id. at 104, 165, 184-85.  Schwartz did not ask Senior

---

[10] Other witnesses also testified that Circle's books reflected these payments as "other income."  Circle's CPA Randy Brown testified that the $6,000 payments were "originally . . . booked as other income."  R24 at 215.  Circle accounts receivable clerk Kenya Diggs said that Kottwitz told her to post the payments as other income.  R20 at 556-57, 559-60.   IRS Agent Lesso testified that the $6,000 payments were recorded as "other income."  R24 at 216-17.

for the documents and never received any documentation for this income.[11] Id. at 104, 165, 184. At the close of Circle's fiscal year 2000, the "other income" account was reclassified under the "note payable officer, loan to officer" account.[12] Id. at 107-08, 120, 177-82.[13] Schwartz explained that he suggested the reclassification because he understood that "it was a return of capital, because of the breakup of the two companies, . . . Senior was owed a lot of money. So, that's what . . . brought me to say that it should have been in note payable rather than income." Id. at 120-21. Schwartz made a journal entry regarding the discrepancy and where the monies should be properly logged. Id. at 122-23, 177-78. After the reclassification of the monies as loans payable to Senior, Circle paid three items on Senior's behalf which were "charged as offset" to what Circle owed Senior: his

---

[11] Schwartz understood that the documents were at Nastasi's attorney's office. R22 at 184.

[12] Despite the reclassification in Circle's accounting, Schwartz did not correct Senior's personal income tax return which did not reflect the missing $300,000 in income. R22 at 182-83; R24 at 232-34. Schwartz admitted that he knew that the tax return needed to be revised, but did not have the necessary legal documents to appropriately account for the unreported income. R22 at 183. Schwartz knew that Senior "never reviewed . . . any of the tax returns" and relied on Schwartz to correctly calculate his taxes. Id. at 174, 185.

[13] Lesso confirmed that the $6000 payments were reclassified as "notes payable officer" account and that Schwartz's explanation for the reclassification was consistent with his analysis. R24 at 217.

2000 New York personal taxes, his 2000 federal personal taxes, and construction costs owed to Seay Construction Services.[14] R24 at 119-23; Govt. Exh. 600.

Schwartz and Kottwitz conferred on other issues when necessary, and Schwartz provided Kottwitz with advice regarding the reporting of personal expenses paid by Circle.[15] R22 at 98, 185. Schwartz basically relied on Kottwitz for all information and documentation, and did not generally confer with the Marchellettas because they "didn't want to get involved" and were unable to provide him with answers when he did ask them questions. Id. at 185-87. Schwartz recognized that Senior was not interested in the technicalities of books or records, and did not review financial information or even his personal tax returns with him. Id. at 174-75, 186. If Schwarz had questions while he was preparing Senior's personal tax return, he communicated with Senior's wife. Id. at 174.

In March 1999, Junior purchased a residential lot on which he planned to build a home. R18 at 186. In April 1999,[16] Junior obtained a $250,000 loan from

---

[14] Seay Construction was actually the builder of Junior's, and not Senior's, residence. R18 at 270, 272, 300.

[15] When Kottwitz asked how to document monies borrowed by an individual from the company in 2003, Schwartz explained that she should set up a note receivable from the company showing a loan receivable. R22 at 185.

[16] Kottwitz was not working for Circle at this time. R20 at 391, 420.

C&G Enterprises, Ltd.,[17] and used it to purchase the lot located on Tullamore Way in Alpharetta, Georgia ["Crabapple"]. Id. at 262; R20 at 553-54; R21 at 851-53; R26 at 248-49, 252. This purchase was not entered on Circle's records.[18] Id. at 248-49. Soon thereafter, Junior found a suitable lot for a home for Senior, and, in September 1999, Senior signed an agreement for the purchase of the property located in Newport Bay Cove, Alpharetta, Georgia ["Newport Bay"] for $270,000. R18 at 321-24; Govt. Exh. 75.1. In October 1999,[19] Senior assigned the contract to Circle and Circle purchased the Newport Bay property for $270,006; the deed was recorded with Circle's name as owner.[20] R18 at 321-22, 358-60; R22 at 75-76; R24 at 200-01; R26 at 284; Govt. Exhs. 24, 75.2, 75.4. The land purchase, which totaled $280,963 with "other amounts," was recorded in Circle's books as a "note payable to officer" meaning that their officer owed Circle $280,963; it was never shown on Circle's books as an asset. R22 at 75-76; R24 at 201-02; R26 at 285, 355. The property was transferred to Senior in March 2002 for $10. Govt. Exh.

---

[17] C&G Enterprises, Ltd., was a Bahamian company owned by George Gorman, one of Junior's close business associates. R18 at 227.

[18] According to Internal Revenue Service ["IRS"] Agent John W. Lesso, this transaction did not go "through the books" of Circle. R26 at 248.

[19] Again, this transaction occurred before Kottwitz began working for Circle.

[20] Lesso testified that the Circle check was made payable to Bank of America. R24 at 201. Lesso and building contractor Marc Dorman acknowledged that Newport Bay was actually owned by Circle during the construction. R18 at 358-60; R26 at 316-17.

25. A certificate of occupancy was issued to Senior for the Newport Bay residence on 10 May 2002, thus permitting Senior to occupy the home. Govt. Exh. 33.

Junior's home construction began in January 2000, after builder Bob Seay had received a deposit for a house on the Crabapple property. R18 at 272, 277-78; Govt. Exh. 114. Seay referred Junior to Robert Frederick, mortgage loan originator at First Colony Bank where Junior subsequently sought a $650,000 construction loan. R18 at 136-37, 141, 278. In January 2000, Senior contracted with builder Allen Dorman, Inc. for the construction of a house on the Newport Bay property. Id. at 338-43; Govt. Exh. 125. Marc Dorman, one of the owners of Allen Dorman, Inc., understood that Senior was the owner of the property and, in the Newport Bay construction contract, Senior was identified as "Owner"; there was no reference to Circle. R18 at 339-43; Govt. Exh. 125.

Beginning in April 2000, the first month of Circle's 2001 fiscal year, Circle began paying many of the contractor bills for the Crabapple and Newport Bay homes.[21] R18 at 207-08, 214-21; R24 at 233. Some of the contractors were paid

_____

[21] See R18 at 217 (Cameron Padgett architect Charles Cameron received a Circle check as down payment on the Newport Bay house which he understood was to be Senior's residence; "most of the checks [came] from Circle"); id. at 285-86 (Seay's subcontractors on the Crabapple house were paid by Circle); id. at 319 (Seay subcontractor Lummus Supply's owner Brandon Underwood was paid by Circle); id. at 338, 349-350, 360 (builder Marc Dorman was instructed by Senior to pick up his draw checks at Circle and was paid by Circle for work on the Newport Bay house); R20 at 600-01, 603, 610-16 (although Diversified Cabinet Distributors' employee Jay Moore had contracted with Junior and Senior, she was paid by Circle for work at the Crabapple and Newport Bay houses); R21 at 631-33, 636 (Gilmore Drywall co-owner Dennis

by Kottwitz or dealt with her regarding their payments.[22]  In an affidavit submitted in an arbitration proceeding between Junior and Seay, Kottwitz indicated that she had made payments on the Marchellettas' homes as "compensation" to the Marchellettas.  R18 at 312-13.  At other times, contractors' payments were approved by Senior or with a Circle check handled by Senior.[23]  Circle also paid some of the vendors who worked on the Marchellettas' homes after the 2001 corporate fiscal year ended.[24]

---

Gilmore was paid by Circle for work on the Crabapple residence); id. at 645-47, 649-50 (Marvin Young, the owner of Shamrock Doors, was paid by Circle for work on the Crabapple residence); id. at 666-67, 669 (Christian Crawford, the owner of Crawford Landscaping was paid by Circle for work on the Crabapple residence); id. at 703, 705-06, 710, 712, 714, 716-17 (Jennifer Testa, an employee of Testa Marble Creations, was paid by Circle for work on the Crabapple residence); id. at 819, 822-23 (Dennis Rose, an employee with Spacemaker Closet Interiors, was paid by Circle for work on a Marchelletta residence); id. at 828, 833 (Angelo Viale, the owner of Iron Works International, was paid by Circle for work on a Marchelletta residence); id. at 835, 839-40 (David Whitcomb, the Chief Financial Officer for Capitol Materials, was paid by Circle for materials used at the Marchellettas' residences); and R23 at 912, 916-18 (Thierry Francois, the owner of Stone Age Designs, was paid by Circle for work on the Crabapple residence).

[22]  See R18 at 349-350 (Dorman received a check from Kottwitz "every once in awhile" and may have seen her write one check); R20 at 615 (Moore received a Circle check air-billed by Kottwitz and spoke with her regarding a check); and R21 at 840 (Whitcomb knew that Kottwitz was Circle's comptroller, and he dealt with her for payments).

[23]  See R18 at 281, 283-84 (Seay discussed the Lummus and Williams Brothers' invoices with Junior and heard Senior approve payments); id. at 349-50 (Dorman received a check from Senior "[e]very once in a while" and may have seen him write one check).

[24]  See R21 at 652-56 (Oscar Hadizadeh, the owner of Allgreen Landscape, worked with Dorman on the Crabapple residence and was paid by Circle); id. at 659, 661, 663 (David White, a co-owner of Specialty Fountains, was paid by Circle for work at the Crabapple  residence); id. at 674-76, 679 (Dan Bartlett with Bartlett Heating & Cooling was paid by Circle for work on the Marchellettas' residences); id. at 686, 690-91 (Jim Rast, owner of Jim Rast Drywall Company, was paid by Circle for work on the Newport Bay residence); id. at 720, 726, 728-29 (Edmond Capozzi, the owner of Modern Industries, was paid by Circle for work on the Crabapple

19

Junior understood that the payments to the contractors from Circle were shown on Circle's books as employee loans but he did not investigate how they were booked. R18 at 306. Senior's home construction project was assigned the name "Newport Bay" for its subdivision and the number 00998; Junior's home construction project was assigned the name "Crabapple" for its subdivision and the number 00999. R20 at 380-81, 553-54; R26 at 243-44. The Marchelletta home construction costs appeared in Circle's books and records as "expenses" and categorized as "cost of goods sold,"[25] and were provided to Schwartz during his audits. R22 at 60, 64-65, 141-145; R24 at 144, 159; R26 at 268, 276, 315-16; Govt. Exh. 328. For Circle's fiscal year ending on 31 March 2001, the home construction jobs listed no income but substantial costs. R20 at 431-32; R22 at 64-

---

residence); id. at 762, 766, 768 (Charlene Lott, a co-owner of American Landmark Fence, was paid by Circle for work on the Crabapple residence); R25 at 1008-09 (Louis Buckman, who installed floor tile and granite countertops, was paid by Circle for work on the Crabapple residence).

[25] The Marchellettas' homes' construction costs were tracked on a "JM" Report, which reflected jobs in progress as project numbers 00998 ("Newport Bay") and 00999 ("Crabapple"). R20 at 381, 552-54; R26 at 277. Schwartz testified that, during his audits, Kottwitz provided him with boxes of materials relating to each of Circle's jobs. R22 at 60. Schwartz acknowledged that he had made handwritten notations on pages of a JM Report that listed expenses for both the Newport Bay and Crabapple jobs, but made no notations as to either job and was unsure whether he had spoken to Kottwitz about them. Id. at 65, 141-45. He explained that he "may not have noticed" the absence of income. Id. at 65.

65; 144-46. The payments for the Newport Bay residence were made directly to the contractors; no payments were made to Senior.[26] R26 at 316-18.

Although both the Newport Bay and Crabapple expenses were recorded in the JM reports, Schwartz did not include them on his 2001 work-in-progress schedule, and did not discuss them with Kottwitz. R22 at 79-80; R26 at 144-45. The JM reports showed that both the Newport Bay and Crabapple jobs contained large expenses and no income. R22 at 65-66. Schwarz noted some of the consulting fees for the home construction jobs in his audit but did not follow-up with a letter to verify their work.[27] R22 at 175-77. The Marchellettas' construction costs were not treated for accounting purposes until after the end of Circle's accounting year on 31 March. R24 at 156-57; R26 at 278. At that time, the costs could be treated as shareholder distribution, straight income or compensation, or as a loan to a shareholder. R22 at 70; R24 at 157-58; R26 at 278-79. Schwartz, however, did not adjust Circle's books regarding the home-related projects and the distributions were reported as cost-of-goods-sold on the 2001 tax return, and did not include the reported distributions as income on the Marchellettas' personal

---

[26] Circle's records reflected over 99% of the expenses paid on the Newport Bay house. R26 at 316.

[27] Specifically, Schwartz noted the fees paid to the architectural firm Cameron Padgett and to Crawford Landscaping. R22 at 175-77.

income tax returns. Id. at 62-65, 76, 78. Schwartz also testified that he was unaware of the construction of the Marchellettas' residences; he explained that Circle's construction of personal residences for the Marchellettas would have been "related party transactions" but that he was never told that Circle was paying for the Marchellettas' construction expenses. Id. at 63, 65-66. He further testified that he "may not have noticed" the project costs on the JM reports and thus the costs, with no related billings, did not constitute a "red flag" for him. R22 at 53-54, 63, 65-66, 69, 71. He claimed that, if he had noticed the costs and realized that Circle had paid for the personal residence construction costs, he would have booked the costs as compensation or as a loan to the Marchellettas when he adjusted the entries in June 2002. R22 at 69-71. Circle also paid for Senior's Alpharetta, Georgia apartment in 2000 and for lawn care at Senior's Long Island, New York home during 2000 and 2001. R21 at 694, 698, 733-35; R24 at 228-32; Govt. Ex. 522, 531. These expenses were booked on Circle's records, respectively, as "office rent" and "consulting fees." R24 at 229-31; R26 at 241-42.

Circle also paid for Junior's visits with business associates to the Gold Club, an Atlanta adult entertainment venue, and clothing purchases. The Gold Club charges appeared on the credit card statements as "Mike's Sports Bar" or "MSB, Inc.," and were recorded on the Circle accounting system as miscellaneous office

or vehicle expenses. R21 at 785-88, 791-92; R26 at 253-54, 257; Govt. Ex. 518.

His clothing purchases, from Hong Kong Tailors, Elegant Fashions of Hong Kong,

in Atlanta, appeared on Circle's credit card. R20 at 588, 590-91, 597-98; R26 at

257; Govt. Exhs. 518, 520, 529. These expenses were recorded on Circle's books

as "vehicle" and "miscellaneous office" expenses. R26 at 259-62.

During the summer of 2002, Schwartz visited Circle to conduct his audit and

prepared tax returns for Circle and the Marchellettas. R22 at 45, 89-93. In the tax

return that Schwartz prepared for Junior, $183,231 was reported as salary from

Circle. R22 at 93; R24 at 100; Govt. Exh. 487. In the tax return that Schwartz

prepared for Senior, $176,000 was reported as salary from Circle. R24 at 129-30;

Govt. Exh. 497. Neither draft tax return reflected any personal expenses paid by

Circle for either Junior or Senior nor did Senior's tax return include any income

from Nastasi. R24 at 104-05, 109-10, 113, 132. In September 2002, following a

United States Custom agent's investigation of Circle's Bahamian construction

project and a subsequent investigation by the Internal Revenue Service,[28] the

Marchellettas were advised not to file any additional tax returns until their previous

returns were reviewed. R25 at 925, 927-30, 959-61. Thus, the 2001 returns

---

[28] The Immigration and Customs Enforcement agent who investigated the Bahamian project notified the IRS of Circle's attorney's "unusual" and "out of left field" concerns as to whether the IRS would be contacted. R25 at 925, 931-33, 955-57.

prepared by Schwartz were never signed nor filed. R22 at 92; R24 at 96-98, 100-02; Govt. Exhs. 487, 497. The investigations, however, continued. R25 at 965-71, 978.

In 2004, the Marchellettas hired CPA Randy Brown, who then met with their attorney and Ted Robertson, a forensic accountant and former IRS agent. R24 at 93, 95. Brown reviewed Circle and the Marchellettas' records, including drafts of unfiled 2001 returns prepared by Schwartz. R24 at 98-99, 102. Brown then prepared and filed 2001 returns for the Marchellettas. Brown included the income from Nastasi in Senior's return, and treated as income the expenses for the houses, credit cards, weekly expense payments, and automobile use for Senior and Junior. Id. at 103, 163; Govt. Exhs. 491, 504. He explained that he reported the payments that Senior received from the "Nastasi stock installment sale" in both 2000 and 2001 and treated the payments as "[l]ong term capital gain" because they were "directly related to the sale of the stock, the exchange of the stock, and not to any consulting services that were provided." R24 at 136, 138-44. He observed that both the Newport Bay and Crabapple home construction costs were shown on the JM reports, which reported less than "a hundred" jobs, but that, since there was "no contract amount for these jobs," it was "obvious" that "something's screwy" because "it doesn't look right." R24 at 168-69. Before the returns were filed, the

24

Marchellettas submitted their estimated tax payments to the IRS.  Id. at 149, 162-63.

An indictment issued against Junior, Senior, and Kottwitz in April 2007, and was followed by a superseding indictment against each of them in July 2007.  R1-1, 42.  Nine felony charges were set forth in the superseding indictment:  (1) Junior, Senior and Kottwitz were charged with conspiracy to defraud the United States by impeding the Internal Revenue Service in the collection of revenue, in violation of 18 U.S.C. § 371 (Count One)[29]; Junior was charged with filing materially false personal income tax returns for 1999 (Count Two) and for 2000 (Count Three) in violation of 26 U.S.C. § 7206(1)[30]; Senior was charged with filing a materially false personal income tax return for 2000 in violation of 26 U.S.C. § 7206(1) (Count Four) and in evading taxes in violation of 26 U.S.C. § 7201 (Count Five)[31]; Junior, Senior, and Kottwitz were charged with aiding and assisting in the

_____

[29]  Under 18 U.S.C. § 371, an individual must have been part of a conspiracy with at least one other person "to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose . . . ."

[30]  "Any person who–[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony . . . ."  26 U.S.C. § 7206(1).

[31]  "Any person who willfully attempts in any manner to evade or defeat any tax imposed . . . or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . ."  26 U.S.C. § 7201.

25

filing of a materially false corporate tax return for 2001 (Count Six), and Kottwitz was charged with aiding and assisting in the filing of a materially false tax return for Junior for 1999 (Count Seven) and for 2000 (Count Eight), and for Senior for 2000 (Count Nine), in violation of 26 U.S.C. 7206(2).[32]

After the jury was selected, the district court provided the jury with initial instructions. The district court advised the jury that they should not consider the lawyers' statements, arguments, questions, and objections as evidence. R17 at 4. Later, during the same instructions, the district court again reminded the jury that the "[o]pening statements are neither evidence nor arguments" and explained that the government's "opening statement . . . is simply an outline to help you understand the evidence as it comes in." Id. at 7.

At trial, the government claimed that Kottwitz and the Marchellettas conspired to file false tax returns in 2000 and 2001. During its opening statement, the government argued that the Marchellettas "knew the tax rules" but chose not to follow them in order to live a lifestyle unattainable by the jurors. R17 at 10, 27. It argued that the Marchellettas "conspired with each other and their long[]time loyal

---

[32] "Any person who–[w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document shall be guilty of a felony . . . ." 26 U.S.C. § 7206(2).

employee, . . . Kottwitz, the bookkeeper" to hide money from taxes by "cooking the books" and "through accounting tricks," and by filing false tax returns.[33]  R17 at 10-11, 23.  It claimed that their crimes were "against the United States and its taxpayers" and provided the Marchellettas with lifestyles replete with "mansions," "custom clothes," and nightclub trips.  Id. at 10-11, 28.

During Senior's attorney's opening statement, he explained that Senior offered Schwartz the opportunity to work with Circle in Atlanta because he had seen Schwartz's work with Schleger for Nastasi, and Schwartz "held himself out as a . . . New York CPA, . . . experienced . . . in the construction industry and . . . an auditor, preparing financial statements."  R17 at 55-56.  Senior's attorney emphasized that Schwartz was given "complete access to all the books of Circle," and conceded that, although Senior's home construction costs were kept on Circle's books, Senior "had nothing to do with instructing anybody in the business over where to classify the [home construction] invoices, . . . to conceal any facts, [or] to bury the cost[s]."  Id. at 56-57, 59.  He further explained that Senior was "not a book person, . . . d[id not] have that background," but was a "blue-collar worker who started out as a young man working hard, . . . an estimator," who

---

[33]  Outside the presence of the jury, the government explained that "Kottwitz form[ed] the hub" with Junior and Senior as the spokes, and "[t]hat the unreported income related to Crabapple flow[ed] through [her]."  R27 at 1025.

27

"relied on professionals, people who wear the suits . . . ." Id. at 59. Kottwitz's attorney also argued that Schwartz was hired for his tax expertise and to make sure the financial records were correct or to make changes if needed, that Kottwitz did not prepare, review, sign, or file any of the tax returns, and that Kottwitz knew so little about taxes that she also asked Schwartz to do hers. Id. at 65-66, 71-73.

IRS revenue agent John Lesso calculated that the Marchellettas' and Circle's transactions resulted in Junior having tax deficiencies of $103,616 for 1999, $56,480 for 2000, and $319,041 for 2001; Senior having personal tax deficiencies of $132,858 for 2000 and $319,832 for 2001; and Circle having corporate tax deficiencies of $105,050 for the fiscal year ending in March 2001, and $510,667 for the fiscal year ending in March 2002. R24 at 236, 247, 258, 260, 262, 268, 271. He explained that the Nastasi payments constituted income to Senior because (1) Anthony Nastasi and Schleger testified that these payments were for services rendered to Nastasi, (2) Circle invoiced Nastasi every week, and (3) Nastasi deducted the payments as expenses. Id. at 210-12. Lesso, however, never examined the separation, payment guarantee, or consulting agreements. Id. at 209. He explained that the reclassification of these payments to the "notes payable officer" account was not inconsistent with his analysis, and that, based on the reclassification of these payments as a loan to Senior, it permitted Senior tax-free

28

use of the income.  Id. at 217-18, 220.  By tracing the $250,000 received by Circle from Nastasi in February 1999, he believed that the money was used in the purchase of the property for Senior's home in October 1999.  Id. at 198-207.

Lesso confirmed that, from 1 January until 1 March, 2000, the $6,000 payments were entered on Circle's books as "other income" and that Circle paid tax on this as income to Circle.  R24 at 216-17; Govt. Exh. 7.3.  He explained that Junior had about $150,506.97 in unreported income and owed a tax deficiency of $56,480 in 2000 as a result of the expenses for the Crabapple home construction and suits, and that he had $798,295.97 in unreported income and owed a tax deficiency of $319,041 for 2001 as a result of the expenses for the Crabapple home construction and other personal expenses.  R26 at 258-62.

Lesso believed that the monies that Circle paid for Senior's apartment and landscaping work constituted unreported personal income taxable to Senior because the expenses were unrelated to Circle's business.  R24 at 228-32; R26 at 242.  He explained that, although temporary housing was a possible business expense, it was limited to a short-term period.  R24 at 231.  He agreed, however, that the Newport Bay property was an asset of Circle's during 2001.  R26 at 316-17.  Although he explained that Circle's expenditures on behalf of Junior and Senior were "taxable when the individual receives an economic benefit," he later

29

testified that the construction expenses on Circle's books could be characterized at the end of the corporation's fiscal year either as loans or income to the shareholders, and that such a determination was not made in this case until Schwartz closed Circle's books, adjusted entries, and prepared and filed Circle's tax returns during June through September 2001. R26 at 275-80, 354.

Robert Hishon, an attorney and CPA who specializes in tax matters, testified on behalf of Junior and Senior. R27 at 1111-13. Hishon opined that Senior's "receipt of $6,000 a week would be proceeds from the sale or exchange . . . of his shares in Nastasi. . . . that would be classified under the Internal Revenue Code as a capital asset, [and] taxed as [long-term] capital gain . . . [and] would qualify . . . as an installment sale." R28 at 1132-33. He explained that, as a capital gain, the "transaction would be taxed by taking the total value of what was received minus the basis" and paid all at once, but that under the Internal Revenue Code, the tax could be paid over a period of time if the payments on the sale were over a period of time. Id. at 1133. He noted that Circle appeared to maintain an "open account" for both shareholders, where things were charged and credited, and that such an account was "not unusual." Id. at 1134. He observed that Circle's payments of the apartment rental for Senior were "ordinary and necessary business expenses . . . as sort of a working condition fringe" benefit to help Senior move from New York to

Atlanta.  Id. at 1138.  He believed that the lodging expenses were either excludable from Senior's gross income as "ordinary and necessary" expenses or deductible because they were temporary, necessary for the employee to participate with the business, and an ordinary and necessary expense for a person who lived in New York and was employed by a Georgia corporation.  Id. at 1141-42.  He stated that the 2000 home construction costs for Senior were "tax neutral" because Circle owned the land and, at that time, was building the house.  Id. at 1142.  He said that the construction costs were taxable to Senior at the end of Circle's 2001 tax year when he obtained the house title as compensation, and observed that Senior then paid the tax.  Id. at 1143-44.  Hishon believed that the lawn maintenance expenses were incorrectly charged to Circle and should have been booked as part of the shareholders' open account.  Id. at 1144-45.

At the close of the evidence, the government dismissed Count Seven against Kottwitz.  R2 at 94; R27 at 1020.  Kottwitz and the Marchellettas jointly moved for an acquittal on all of the remaining counts, arguing that there was no evidence that they intended to violate the tax laws, and that their due process rights were violated by the government's improper references during trial to their wealth.  Id. at 1022-23, 1027, 1035, 1037, 1039-45, 1047-48.  These motions were denied.  R2 at 94; R27 at 1049.

31

Kottwitz and the Marchellettas requested a "reliance on accountant" jury

instruction.[34] R1-81 at 26; R5 at 81, Exh. A at 15; R28 at 1199-1200. Based on its

_____

[34] The Marchellettas' requested instruction read:

Good faith is a complete defense to the charges in the indictment since good faith on the part of the Defendant is inconsistent with the existence of *intent to defraud or* willfulness which is an essential part of the charge. *Specific intent to defraud or willfulness "may be negated by a good-faith misunderstanding of law or a good-faith belief that one is not violating the law . . . "* The burden of proof is not on the Defendant to prove good faith, of course, since the Defendant has no burden to prove anything. The Government must establish beyond a reasonable doubt that the Defendant acted willfully *and with specific intent* as charged in the indictment.

*"Good faith reliance on a qualified accountant . . . [is] a defense to willfullness in cases of tax fraud."* So, a Defendant would not be "willfully" doing wrong if, before taking any action with regard to the alleged offense, the Defendant consulted in good faith an . . . *accountant* whom the Defendant considered competent, made a full and accurate report to that . . . *accountant* of all material facts of which Defendant had the means of knowledge, and then acted strictly in accordance with the advice given by that . . . *accountant.*

Whether the Defendant acted in good faith for the purpose of seeking advice concerning questions about which the Defendant was in doubt, and whether the Defendant acted strictly in accordance with the advice received, are all questions for you to determine.

*Also a complete defense to the charges in the indictment is where the tax violation was the result of a failure of an accountant to exercise due care or diligence, and not the result of the Defendants' actions. Title 26, Code of Federal Regulations, Section 16694-1 provides that an accountant or tax preparer who prepares taxes for a person "may not ignore the implications of information furnished to the preparer or actually known to the preparer. The preparer must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete . . . The preparer must make appropriate inquiries to determine the existence of facts and circumstances required by a[n] [Internal Revenue] Code section or regulation as a condition to claiming the deduction."*

*Article V, Section 56 of the American Institute of Certified Public Accountants Code of Professional Conduct and Article V of the New York State Society of CPA's Principles of Professional Conduct provide, in relevant part, that "[d]ue care requires [an accountant] to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform professional services to the best of a member's ability with concern for the best interest of those for whom services are performed and consistent with the [accounting] profession's responsibility to the public." "[Accountants] should be*

32

interpretation of United States v. Johnson, 730 F.2d 683 (11th Cir. 1984), the district court denied the instruction, finding that the good faith reliance instruction required that the defense "show, one, that [the defendants] fully disclosed all relevant facts to the expert and, two, that [the defendants] relied in good faith on the expert's advice." R22 at 1200. It commented that "there [wa]s no evidence that the defendant[s] supplied all relevant information to their accountant or accountants and relied in good faith on accountant's opinion" and that the instruction was not appropriate as it was not "adjusted to the facts." Id. at 1199-1200. Junior's counsel responded that, as to the 2001 returns initially drafted by Schwartz and ultimately prepared by Brown, he did not want to be foreclosed from arguing that they had presented "testimony through Brown and through Hishon that the defendants believed that what they did in filing the 2001 returns fixed the problem, if you will. And that is reliance on the advice of an expert." R28 at 1200-01. The government objected that it did not "think the [c]ourt should put its

---

*diligent in discharging responsibilities to clients . . . Diligence imposes the responsibility to render services promptly and carefully, to be thorough, and to observe applicable technical and ethical standards.*

> *If you find that an accountant or tax preparer ignored any information, did not make reasonable inquiries as to whether any information provided to him was complete and correct, or otherwise was not diligent, thorough or careful to the best of his ability, and that the failure to exercise due care caused the tax violations charged in the indictment, you must acquit the Defendants.*

R5-81, Exh. A at 15 (italics are the Marchellettas' additions to the Eleventh Circuit Pattern Jury Instructions).

33

imprimatur on Randy Brown's advice" and that the defendants were asking that the court "essentially ignore their contemporaneous intent to . . . look to what they did after the fact." Id. at 1201-02. When the district court asked whether it was not sufficient for the government "just to make that argument to rebut [Junior's attorney's] point," the government responded that was "what [it] would do," to which Junior's attorney replied, "[t]hat's all I need." Id. at 1202.

During closing arguments, the government claimed that Kottwitz was "central" to the tax scheme, and characterized Kottwitz's statement, to wit, that she understood Circle's payments for the Marchellettas' residences as "income" to the Marchellettas, as a "lie[] . . . under oath." R29 at 1265; see also R18 at 312-13. It suggested that Kottwitz was liable for the conspiracy and the tax fraud because she failed to disclose to Schwartz that Circle was paying for the Marchellettas' residences. R29 at 1256. The government also maintained that, because the Marchellettas did not direct allocation of their home construction costs to any specific account, the "payables clerks . . . had no idea" how the Marchellettas would treat the income shown on their home job ledgers or whether or not they would actually declare it as income. Id. at 1268. It suggested that the defense argument that "Schwartz was supposed to know about" the inclusion of the Marchellettas' personal expenses in Circle's expense logs was "nonsense" since he

34

only reviewed the accounts on "one day." Id. at 1329-30. Senior's attorney's closing argument emphasized that there was no evidence that he had any knowledge of how entries were booked on Circle's accounting records, that certain entries should have alerted Schwartz to potential problems and the need to file amended returns, and that Senior had no criminal intent to violate the tax laws. Id. at 1303-04.

The district court instructed the jury to base its verdict only on the evidence and the court's instructions on the law, and not on the lawyers' statements. Id. at 1214-16; see also R6-113 at 2-3. The court provided the jury with a general instruction on the elements of a good faith defense to the charge of intent to defraud and on willfullness.[35] R29 at 1228-30; R6-113 at 19-21. After closing

---

[35] The court's good faith instruction provided:

> Good faith is a complete defense to the charges in the indictment since good faith on the part of the defendant is inconsistent with intent to defraud or willfulness[,] which is an essential part of the charges. While the term 'good faith' has no precise definition, it means an honest belief, a lack of malice, and the intent to perform all lawful obligations. The burden of proof is not on the defendant to prove good faith, of course, since the defendant has no burden to prove anything. The Government must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the Indictment.
> One who expresses an honestly held opinion, or an honestly formed belief, is not chargeable with fraudulent intent even though the opinion is erroneous or the belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.

R29 at 1228-29.

arguments, the jury was excused for lunch, instructed to begin deliberations when they returned to the jury room, and advised that they would be provided with the admitted exhibits and a copy of the indictment and verdict form. Id. at 1340. With the jury out of the courtroom, Junior's attorney notified the district court that he had prepared a written objection to court's denial of the requested jury instructions; the district court instructed him to "[j]ust file it." Id. at 1343-44. In the written objection, Junior observed that the district court had "refused to give the Defendants' proposed Jury Instruction Number 15, concerning 'Good Faith Reliance Upon . . . Accountant Failure of Accountant to Exercise Due Care'" and

---

The district court's willfullness instruction stated:

The word 'willfully,' . . . means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law.
. . .
So, if you find beyond a reasonable doubt that the acts constituting the crime charged were committed by a defendant voluntarily as an intentional violation of a known legal duty; that is, with specific intent to do something the law forbids, then the element of 'willfulness' as defined in these instructions has been satisfied.

On the other hand, if you have a reasonable doubt as to whether a defendant acted in good faith, sincerely believing that the tax returns in question were true and correct as to every material matter and that no additional tax was owed, then the defendant did not intentionally violate a known legal duty; that is, the defendant did not act 'willfully'--and that essential part of the offense would not be established. It is not the purpose of the tax laws to penalize innocent errors made despite the exercise of reasonable care, and it is not enough to show merely that a lesser tax was paid than was due. Nor is a negligent, careless, or unintentional understatement of income sufficient.

Id. at 1229-30.

argued that "the district court should have granted the [good faith reliance] instruction." R2-95 at 4.

Following deliberations, the jury found Kottwitz not guilty of Counts Eight and Nine (aiding and abetting Junior and Senior in the filing of materially false personal returns for 2000), and found Junior not guilty of Count Two (filing a materially false personal return for 1999). R2-109 at 2-4. Kottwitz was convicted on Counts One and Six; Junior was convicted on Counts One, Three and Six; and Senior was convicted on Counts One, Four, Five, and Six. Id. at 3.

Kottwitz and the Marchellettas jointly moved for an acquittal on all of the counts of conviction, arguing that there was no evidence to support a finding of intent to violate the tax laws, and that the government's improper references during the trial to their wealth violated due process rights. R2-106; R2-127 at 4-5, 24-26. They argued, inter alia, that "many, if not all, of the government's specific items of alleged omitted income were not required to be reported as income for [the] year in question." R2-127 at 9. The district court denied the motion, finding that there was substantial evidence from which a reasonable jury could have found criminal intent to violate the tax law and that the government properly introduced evidence of the defendants' wealth because the evidence of their failure to report a high volume of income was relevant to their willfulness. R2-134.

At sentencing, Senior objected to the probation officer's determination as to the amount of the tax loss. R30 at 21-24, 32-37, 39-42, 45. The district court overruled Senior's objections and found that the loss amount was between $1,000,000 and $2,500,000. Id. at 54-55. Kottwitz was sentenced to twenty-four months of imprisonment on each of the two counts of conviction, to run concurrently, and three years of supervised release on each count, to run concurrently. R30 at 147. She was also fined $2500 and assessed $200. Id.; see also R10-156. Junior was sentenced to thirty-six months of imprisonment on each of the three counts of conviction, to run concurrently, thirty-six months of supervised release on Count One and twelve months of supervised released on each of Counts Three and Six, to run concurrently. R30 at 146. He was also fined $50,000 and was assessed $300. Id.; see also R3-154. Senior was sentenced to thirty-three months of imprisonment on each of the four counts of conviction, to run concurrently and thirty-six months of supervised release on each count of conviction, to run concurrently. R30 at 145-46. He was also fined $50,000 and was assessed $400. Id. at 146. Kottwitz and the Marchellettas were each released on bond pending appeal. R10-186.

## II. DISCUSSION

On appeal, Kottwitz, Junior, and Senior argue that the evidence was insufficient to support their convictions and that the district court erred in refusing to give the jury a good faith reliance on accountant instruction.[36]

### A. Insufficiency of the Evidence

Kottwitz, Junior, and Senior contend that the trial evidence was insufficient to show the existence of a tax conspiracy, that they knowingly participated in any conspiracy that may have existed, or that they aided and abetted in the filing of a false tax return for Circle in 2001. Senior maintains that, because he was owed $250,000 at the end of 1999 from the assignment of the loan made by Nastasi to Circle and the stock swap, any personal expenditures made by Circle for him should have been credited against the notes payable, thus reducing Circle's debt to him. As such, the expenditures were properly accounted for and did not result in any taxable income to him. Senior also argues that the evidence was insufficient to show that he knowingly evaded taxes or filed a false tax return for 2000. Kottwitz

---

[36] Junior adopted Senior's sufficiency argument; Senior adopted Junior's argument on this issue regarding the timing and tax consequences of the home construction expenses, and application of Boulware v. United States, 552 U.S. 421, 128 S. Ct. 1168 (2008).

Kottwitz adopted Junior's and Senior's arguments regarding the reliance on accountant instruction, and both Junior and Senior adopted each other's arguments on this issue.

Junior and Senior also raised the issue of prosecutorial misconduct, and Senior raised an issue regarding sentencing. Because we reverse, we will not address these issues.

maintains that the evidence showed she consistently tried to do the right thing and never saw any of the tax returns at issue or had any expectation that the filed returns would be materially false. She contends that there is no trial evidence showing that she knew of any conspiracy that would result in the filing of false tax returns or that she agreed to join any such conspiracy. Junior and Senior also argue that the district court erred by denying their motion for judgment of acquittal because, under Boulware v. United States, 552 U.S. 421, 128 S. Ct. 1168 (2008), distributions made to a shareholder of a closely-held corporation cannot be classified for tax purposes until the final date of the corporation's fiscal year.

We review both a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal de novo. United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008) (per curiam); United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002) (per curiam). "[W]e view the evidence in the light most favorable to the government," making all reasonable inferences and credibility choices in the government's favor, and then "determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." Mercer, 541 F.3d at 1074. We will uphold a Rule 29 motion denial if we "determine that a reasonable fact-finder could conclude that the evidence

established the defendant's guilt beyond a reasonable doubt." Descent, 292 F.3d at 706 (quotation marks and citation omitted).

1. *Conspiracy*

A conspiracy to defeat the Internal Revenue Service's ("IRS") lawful functioning and victimize the IRS is known as a Klein conspiracy. United States v. Adkinson, 158 F.3d 1147, 1154 (11th Cir. 1998) (citing United States v. Klein, 247 F.2d 908 (2d Cir. 1957)). The government must show not only (1) the requisite act of a failure to properly report income but also (2) an agreement between at least two conspirators to impede the IRS' functioning and (3) knowing participation in such a conspiracy. Adkinson, 158 F.3d at 1153. Although the requisite act requirement is established by the failure to properly report income, such, without more, is insufficient to establish a conspiracy. Id. at 1154. The requisite acts must be considered under "the objective economic realities of a transaction rather than . . . the particular form the parties employed." Boulware, 552 U.S. at 429, 128 S. Ct. at 1175 (quotation marks and citation omitted). The agreement requirement must be established by evidence of actual knowledge by each participant that a conspiracy between at least two participants intending to obstruct the IRS's collection of owed tax revenue was in progress and by evidence of each participant's knowing and voluntary intentional participation in it. Adkinson, 158

41

F.3d at 1153-54. The evidence must show a "common agreement" to violate the law. Id. at 1155 (quotation marks and citation omitted). The evidence of such an agreement may be circumstantial or direct, and may be inferred from the parties' concerted actions, overt acts, relationship, and the entirety of their conduct. United States v. Schwartz, 541 F.3d 1331, 1361 (11th Cir. 2008). If the conspiracy evidence is circumstantial, it must warrant a jury finding that the conspirators operated with a "*common design with unity of purpose* to impede the IRS" based on "reasonable inferences, and not mere speculation." Adkinson, 158 F.3d at 1154, 1159 (quotation marks and citation omitted); United States v. Perez-Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994). See also Ingram v. United States, 360 U.S. 672, 678-79, 79 S. Ct. 1314, 1319-20 (1959) (knowledge of tax liability is essential); United States v. Gurary, 860 F.2d 521, 524 (2d Cir. 1988) (stating that the government must present "evidence from which the jury could infer that defendants knew their scheme would result in the filing of false . . . tax returns, and deliberately proceeded with their scheme in the face of that knowledge"). A conspiracy conviction cannot stand without evidence showing a meeting of the minds to commit the illegal act. Adkinson, 158 F.3d at 1155. Circumstantial evidence that income has been disguised as non-taxable proceeds is not sufficient;

the government must also show statements of co-conspirators manifesting a desire to impede the IRS. United States v. Pritchett, 908 F.2d 816, 822 (11th Cir. 1990).

The knowledge requirement must be established by evidence that each alleged conspirator knew that the scheme would culminate in the filing of false tax returns. Adkinson, 158 F.3d at 1155. Evidence of a conspiracy or that a defendant acted in a way that would have furthered "a conspiracy *if there had been one*" is insufficient; there must also be independent evidence that the defendants knew of the conspiracy in progress and knowingly and voluntarily joined it. Id. (citation omitted). Due to the complexity of the tax laws, specific intent or "willful" conduct is a necessary element of tax offenses. Cheek v. United States, 498 U.S. 192, 200, 111 S. Ct. 604, 609 (1991). "This tax purpose [to interfere with the IRS's lawful functions in collecting taxes] must be the *object* of a Klein conspiracy, and not merely a foreseeable consequence of some other conspiratorial scheme." Adkinson, 158 F.3d at 1155. The Klein conspiracy to impede the IRS must be the object, or at least an object in a conspiracy with multiple objectives; it is not adequate if the act of impeding the IRS is "only a collateral effect of an agreement." Id. (quotation and citation omitted). Evidence that owners directed their accountant to refer any questions to them and failed to disclose to their accountant payments to some employees or unreported revenue was sufficient to

43

support a conspiracy conviction for IRS fraud.  United States v. Useni, 516 F.3d

634, 650 (7th Cir. 2008).

Despite the lack of direct evidence that Kottwitz and the Marchellettas

conspired to impede the IRS, the circumstantial evidence was sufficient for the jury

to have concluded beyond a reasonable doubt that they had entered into the

charged conspiracy (Count One).  Kottwitz oversaw the accounting books and

knew where the various home and personal expenses of the Marchellettas were

booked on the Circle accounts.  She communicated with Schwartz concerning

theses expenses in conjunction with both the Circle and Marchelletta tax returns.

Kottwitz, Junior, and Senior had a long-standing employment relationship and

were not distant.

2. *Filing of a False Income Tax Return*

Junior and Senior contend that the home construction costs were the only

basis for the jury's verdict related to Junior's 2000 tax return.  The jury rejected the

prosecution's accusation that Junior had understated his income on his 1999 tax

return by failing to include the $250,000 loan from C&G enterprises or the

clothing and entertainment expenditures (which were omitted from both the 1999

and 2000 returns) (Count Two).  They assert the Boulware objective

characterization rule requires consideration of (1) the timing or tax year of the

44

recognition of the distribution and (2) the classification of the transaction as compensation, loans, dividends, returns of capital, or gains from the exchange or sale of property. They reason that Junior's home construction cost distributions could not be assigned to him as income in 2000 because it was impossible for Circle to classify the distributions paid after 1 April 2000 until its fiscal year closed in March 2001 and that the deposit made in January 2000 was de minimis and, therefore, not a material matter. They suggest that Boulware's holding as to 26 U.S.C. § 7206(1) extends to § 7206(2) since both contain similar language regarding the truthfulness of the tax return: "every material matter" in § 7206(1) and "any material matter" in § 7206(2). They maintain that the only expense paid by Circle on Junior's home before 1 April 2000 was the general contractor's deposit paid in January 2000.

The government responds that the evidence was sufficient to sustain the convictions because it showed that the Marchellettas skimmed over $1,000,000 from their company to fund personal expenses, failed to disclose this information to their accountant, and signed false tax returns omitting this income. They also maintain that Kottwitz facilitated the Marchellettas' actions by writing checks and supervising Circle's books which showed the expenditures as business expenses.

Randy Brown, a certified public accountant who prepared amended 2001 tax returns and subsequent returns for Circle and the Marchellettas, explained that Circle's 2001 tax year began on 1 April 2000 and ended on 31 March 2001. R24 at 106-07. Circle spent $144,000 during the 2000 calendar year and $908,000 during the 2001 tax year on Junior's home construction costs. Id. at 106, 108, 111. Brown stated that the construction costs were not due to be reported as income to Junior until the costs were "expensed" by Circle, and could "be treated as an officer loan until the point that the company takes it as a deduction." Id. at 107. Brown prepared Junior's 2001 personal tax return in 2004, and explained that Junior's income of $1,330,546 was a result of his wages, dividends, and various "officer advances" which he received from Circle including the home construction costs in 2000 and 2001 and personal credit card and auto use expenses. Id. at 115-16. He stated that the advancement of monies from a company to a shareholder "happens a lot" such as loans or personal credit card expenses. Id. at 117. He explicated that "it depends on the internal accounting of the company" as to when or whether an expense was initially "treated as an officer advance" or was "buried" in other expenses such that the classification of the expense would have to wait until the company's financial statement adjustments "at the end of the year." Id. at 117-18; see also IRS Agent John W. Lesso's testimony that "nothing's final until

the financial statements are prepared." R26 at 278. Junior testified that he understood the construction expenses to be "an employee loan." R18 at 306.

Circle paid a $36,456 deposit, due five days within the commencement of construction, on Junior's home in January 2000. R18 at 27-78. No other expenses were paid on behalf of Junior's home construction until April 2000. Id.

For a conviction under 26 U.S.C. § 7206(1), the government must prove that the defendants: (1) filed a tax return with a written declaration made under the penalty of perjury; (2) did not believe the return to be true and correct as to every material matter; and (3) acted willfully and not merely negligently. United States v. Edwards, 777 F.2d 644, 651 (11th Cir. 1985). A conviction under § 7201 requires that the government show that the defendants (1) acted willfully; (2) deficiently paid their taxes; and (3) affirmatively acted to evade or attempted to evade their taxes. Sansone v. United States, 380 U.S. 343, 351, 85 S. Ct. 1004, 1010 (1965). Therefore, the specific intent of willfullness is a requirement in both offenses. United States v. Lankford, 955 F.2d 1545, 1550 (11th Cir. 1992) (§ 7206(1); Sansone, 380 U.S. at 351, 85 S. Ct. at 1010. The willfulness standard requires "'the voluntary, intentional violation of a known legal duty'" and can be "negated by a good-faith misunderstanding of the law[,] a good-faith belief that one is not violating the law, regardless of whether or not the belief is reasonable,"

47

or a good-faith reliance on a professional's advice. United States v. Morris, 20 F.3d 1111, 1114-15 (11th Cir. 1994) (citing Cheek, 498 U.S. at 202, 111 S. Ct. at 610-11).

In Boulware, the Supreme Court noted that tax classifications mandated consideration of "the objective economic realities of a transaction rather than . . . the particular form [of classification] that the parties employed." Boulware, 552 U.S. at 429, 128 S. Ct. at 1175. The Court held that intent is irrelevant to the timing of objective tax classifications and IRS reporting requirements for distributions to shareholders of closely held corporations; objective application of the Internal Revenue Code Sections 301 and 316 apply. Id. 424-25, 434, 439, 128 S. Ct. at 1173, 1179, 1182. Specifically, it stated that a criminal tax "defendant . . . does not need to show a contemporaneous intent to treat diversions as returns of capital before relying on [Sections 301 and 316] to demonstrate that no taxes are owed." Id. at 439, 128 S. Ct. 1182. The Supreme Court applied Boulware to 26 U.S. C. § 7206(1) cases noting that "[a]lthough . . . § 7206(1) does not require the prosecution to prove the existence of a tax deficiency, . . . the nature and character of the funds received can be critical in determining whether . . . § 7602(1) has been violated." Id. at 433 n. 9, 128 S. Ct. 1178 n.9 (internal quotation marks and citations omitted). The Court noted that classifications of transactions between

closely-held corporations and shareholders may be difficult because "a corporation

and its shareholders have a common objective-to earn a profit for the corporation

to pass onto its shareholders," that a "corporation . . . wholly owned by one

shareholder . . . becomes the alter ego of the shareholder in his profit making

capacity," and that, by "passing corporate funds to himself as shareholder," the

owner-shareholder "is acting in pursuit of these common objectives."[37] Id. at 438

n.13, 128 S. Ct. 1181 n.13 (citing Truesdell v. Comm'r, IRS Non Docketed Service

Advice Review, 1989 WL 1172952 (Mar. 15 1989)) (internal quotations omitted).

"[E]conomic substance remains the right touchstone for characterizing funds

received when a shareholder diverts them before they can be recorded on the

corporation's books" as the diverted funds may be treated as "dividends or capital

distributions" based on the benefit received by the shareholder. Id. at 430, 128 S.

Ct. 1176. If it is unclear, however, whether the corporation will have sufficient

funds to cover distributions to its shareholders at the end of its tax year, it must

---

[37] In United States v. Williams, 875 F.2d 845 (11th Cir. 1989), we held that the government was not required to "characterize diverted income in criminal tax cases" by determining whether the income was properly classified as a "constructive dividend" based on sufficient corporate earning and profits to cover the income as a "dividend." Id. at 851-52. In Boulware's discussion of the circuit split "over the application of §§ 301 and 316(a) to informally transferred or diverted corporate funds in criminal tax proceedings," the Supreme Court observed that, in Williams, we had taken the position that §§ 301 and 316(a) were "altogether inapplicable in criminal tax cases involving informal distributions." Boulware, 552 U.S. at 428  n.6, 128 S. Ct. at 1175 n.6.

report the distributions as dividends even if the distribution will later be treated as a capital gain or a return on capital.  Id. at 434 n.11, 128 S. Ct. 1179  n.11.

"[A] distribution of property . . . made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c)."[38]  26 U.S.C. § 301(a).  Subsection (c) provides that, if the amount of the distribution constitutes a dividend, it should "be included in gross income;" if the amount which is not a dividend, it should "be applied against and reduce the adjusted basis of the stock;" and, if the amount "which is not a dividend . . .exceeds the adjusted basis for the stock," it should "be treated as gain from the sale or exchange of property."  § 301(c)(1)-(3)(a).  Income should be included in an individual's gross income during the year that it is received by the taxpayer.[39]  26 U.S.C. § 451(a); 26 C.F.R. § 1.301-1 (a dividend becomes taxable when it is "unqualifiedly made subject to [the shareholders'] demands."); Avery v. Comm'r of Internal Revenue, 292 U.S. 210, 215, 54 S. Ct. 674, 676 (1934) (a dividend becomes taxable to the

---

[38]  For tax purposes, "'property' means money, securities, and any other property;" it "does not include stock in the corporation making the distribution."  26 U.S.C. § 317(a).
[T]he term 'dividend' means any distribution of property made by a corporation to its shareholders–(1) out of its [retained] earnings and profits . . . , or (2) out of its earnings and profits of the tax year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year) without regard to the amount of the earnings and profits at the time the distribution was made.  26 U.S.C. § 316(a).

[39]  "[T]he time of actual receipt of the dividend govern[s] its inclusion in taxable income."  Dynamics Corp. of America v. United States, 392 F.2d 241, 248 (Ct. Cl. 1968).

shareholder upon actual receipt).  The receipt of income can be actual or

"constructive."  "Constructive receipt" of income occurs when it is  "is credited" to

the taxpayers account and he can draw upon it.  26 C.F.R. § 1.451-2(a).

Constructive receipt does not occur, however, "if the taxpayer's control of [the

received income] is subject to substantial limitations or restrictions."  Id.  A

constructive dividend is a   corporate disbursement for the benefit of a shareholder

and must be reported by the shareholder as income.[40]  United States v. Mews, 923

F.2d 67, 68 (7th Cir. 1991).

Although the personal expense entries in Circle's books could not have been

characterized as dividends or balanced in relation to Junior's and Senior's

shareholder interests until the end of Circle's accounting year, the jury possessed

---

[40]  Further, distributions are "regarded as dividends where a corporation makes a loan to a shareholder and later cancels the indebtedness, or sells property to a shareholder for a purchase price for below its fair market value, or pays compensation to an officer-shareholder in an amount in excess of the value of his services."  Dynamics Corp., 392 F.2d at 246.  "It is not the intent of the parties that governs the characterization of the distribution, but rather the economic and consequent legal effect of their actions."  Id. at 247.  Intent, however, may be considered in the determination of whether or not a distribution was a loan to a shareholder.  Haber v. Comm'r of Internal Revenue, 52 T.C. 255, 266 (1969).  In such a determination, the intent of the parties at the time of the distribution is key: the shareholder's intent to repay the loan and the corporation's intent to enforce such an obligation.  Id.  Evidence of such intent may be shown by notes of indebtedness, collateral or other security provided for repayment of the loan, agreements as to the time of the repayment and the amount of interest to be paid, or corporate resolutions regarding the loan.  Id.
   If there is insufficient evidence of a shareholder loan, a shareholder's receipt of corporate receipts is "treated as a constructive distribution . . . taxable as a dividend to the extent of corporate earnings and profits for the corporate fiscal year in which it occurred."  Midwest Stainless, Inc. v. Comm'r of Internal Revenue, T.C.M. 2000-314, *4 n.5 (2000).

sufficient evidence to convict on Counts Three, Four and Five. Circle's payment of $5,000 for suits and $8,000 for night-club visits for Junior, which were erroneously labeled on Circle's books and not reported by Junior as personal income, provided sufficient substantive evidence of the understatement of income. Circle's payments of New York landscaping fees for Senior, which were not reported by Senior as personal income, provided sufficient substantive evidence of the understatement of income. Further, if the jury determined that Circle's payment of the landscaping fees constituted personal income to Senior, the objective element of a tax deficiency was met to satisfy the charge that Senior evaded taxes. Viewing the evidence in the light most favorable to the government, the jury could find sufficient circumstantial evidence to support a finding of intent and willfulness on these counts.

*3. Aiding and Abetting the Filing of a Materially False Income Tax Return*

To prove a charge under 26 U.S.C. § 7206(2), the government must show that the defendant "(1) willfully and knowingly aided or assisted (2) in the preparation or filing of a federal income tax return (3) that contained material statements that the defendant knew to be false." United States v. Parker, 277 Fed. Appx. 952, 957 (11th Cir. 2008) (per curiam) (citing United States v. Searan, 259

F.3d 434, 441 (6th Cir. 2001)).  Although the defendant's preparation of the returns is not essential, the government must prove that the defendant knowingly provided false documentation with the expectation that it would be used in the filing of a tax return.  United States v. Wolfson, 573 F.2d 216, 225 (5th Cir. 1978); United States v. Aracri, 968 F.2d 1512, 1524 (2nd Cir. 1992) (convictions under § 7602(2) upheld where the "defendants knew that their scheme would result in the filing of false tax returns.").

In this case, no evidence suggests that Kottwitz or the Marchellettas knew that Circle would file a false 2001 tax return.  Kottwitz and the Marchellettas never saw the tax return before it was filed or took any action in preparation of it with an expectation that it would be filed with materially false statements.  Their convictions on Count Six are reversed.

B.  Failure to Give the Requested Good Faith Reliance Jury Instruction

Kottwitz and the Marchellettas argue that the district court erred by failing to give their proposed jury instruction regarding good faith reliance on Schwartz's accounting advice and his failure to exercise due care in his audit of Circle.  They maintain that the district court misapprehended the law regarding what the jury needed to decide in order for a defendant to succeed as opposed to when they should be instructed for their ultimate determinations as to guilt or innocence.

They contend that there was overwhelming evidence that Schwartz failed to exercise due care of diligence in discharging his duties.

The government responds that Kottwitz and the Marchellettas were not entitled to a good faith reliance instruction because Schwartz never advised them how to record and report the personal expenditures on their tax returns, they never told Schwartz about the payments, and they gave him false books that disguised the payments. It maintains that the charge would have confused the jury and was unnecessary because the court provided an instruction regarding the high standard of criminal intent and that "good faith is a complete defense." Finally, it asserts that we should review this issue for only plain error because Junior never articulated any specific evidentiary grounds in support of the charge and did not object to its omission until after the jury had retired.

We review de novo the issue of whether a requested jury instruction is supported by sufficient evidence, United States v. Calderon, 127 F.3d 1314, 1329 (11th Cir. 1997), and review the district court's refusal to give such an instruction for abuse of discretion, United States v. Morris, 20 F.3d 1111, 1114 (11th Cir. 1994). A district court abuses its discretion in denying a requested jury instruction if: (1) the instruction is correct; (2) the instruction was not substantially covered by the given charge; and (3) the defendant's ability to present an effective defense was

54

seriously impaired by the failure to give the instruction.  United States v. Sirang, 70 F.3d 588, 593 (11th Cir. 1995).  "The district court has broad discretion in formulating jury instructions as long as those instructions are a correct statement of the law."  United States v. Garcia, 405 F.3d 1260, 1273 (11th Cir. 2005) (per curiam).  Further, because "[a] confused jury can give as improper a verdict as one which has failed to receive some significant instruction, . . . the charge should be direct and focus the jury's attention on the evidence given at trial."  United States v. Blair, 456 F.2d 514, 520 (3d Cir. 1972).

In objecting to a district court's failure to provide a requested jury instruction, the objecting party must advise the court before the jury retires to deliberate of its specific objection and the evidentiary grounds upon which the objection was based.  Fed. R. of Crim. Proc. 30(d).  The objection must be specific and timely, United States v. Wright, 392 F.3d 1269, 1277 (11th Cir. 2004), as "a general objection . . . will not suffice," United States v. Gallo-Chamorro, 48 F.3d 502, 507 (11th Cir. 1995).  An objection is timely even if made after the jury has been excused as long as the jury was told not to begin deliberations until further notice.  See United States v. Eiland, 741 F.2d 738, 742 (5th Cir. 1984).  Although "we do not insist on an extremely technical reading of Rule 30, the objection should be sufficient to give the district court the chance to correct errors before the

case goes to the jury." Sirang, 70 F.3d at 594 (citations omitted). Objections to the district court's erroneous belief that the requested instruction was an "incorrect statement of the law," United States v. Yeager, 331 F.3d 1216, 1223 (11th Cir. 2003), objections "as a matter of form" to the denial of all of the requested instructions, United States v. Flynt, 15 F.3d 1002, 1006 (11th Cir. 1994) (per curiam) (quotation marks omitted), and objections that do not address the district court's explanation for its denial of the instruction because it was "not tailored to the evidence," are inadequate to preserve the issue on appeal, Sirang, 70 F.3d at 594 (quotation marks omitted). A non-preserved objection to a court's failure to give a requested jury instruction is reviewed under the more stringent standard of plain error. Fed. R. Crim. P. 52(b). As we have explained, a plain error is one that is clear, is obvious under current law, and that affects substantial rights. United States v. Eckhardt, 466 F.3d 938, 948 (11th Cir. 2006).

A trial court is not free to determine the existence of the defendant's theory of defense as a matter of law; it is established by the defendant's presentation of an evidentiary and legal foundation and, once established, the defendant is entitled to jury instructions on that defense theory. United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995); United States v. Williams, 728 F.2d 1402, 1404 (11th Cir. 1984). The requested jury instruction should "precisely and specifically, rather than

merely generally or abstractly, point [] to the theory of . . . defense." Morris, 20 F.3d at 1117 (quotation marks and citations omitted).  The law is clear that  the defendant's burden is light as "*any foundation* in the evidence" is sufficient even if that evidence is of doubtful credibility, frivolous, imprudent, inconsistent, insufficient, unbelievable, or weak.  United States v. Opdahl, 930 F.2d 1530, 1535 (11th Cir. 1991) (citation omitted); United States v. Middleton, 690 F.2d 820, 826 (11th Cir. 1982); Strauss v. United States, 376 F.2d 416, 419 (5th Cir. 1967).  "[I]t is reversible error to refuse to charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent."  United States v. Edwards, 968 F.2d 1148, 1153 (11th Cir. 1992) (quotation marks and citation omitted).

"The defense of good faith reliance on expert advice is designed to refute the government's proof that the defendant intended to commit the offense."  United States v. Johnson, 730 F.2d 683, 686 (11th Cir. 1984) (internal quotation marks omitted).  Such a defense is successful when the defendants establish that they (1) fully disclosed all relevant facts to the expert and (2) relied in good faith on the expert's advice.[41]  Id.  Once the defendant charged with willful income tax evasion

_____

[41]  Where the accountant "possesse[s] all of the relevant facts concerning [the transactions at issue] from the outset," it is not necessary that the defendant show "that *he* personally disclosed all pertinent facts to the accountant."  United States v. Lindo, 18 F.3d 353, 356 (6th Cir. 1994).

presents evidence that he disclosed all of the relevant facts to a competent tax advisor and relied on the advisor's advice based on his disclosures, he is entitled to a jury instruction on the defense of good faith reliance on the advice of his advisor. United States v. Eisenstein, 731 F.2d 1540, 1543-44 (11th Cir. 1984) (citing Bursten v. United States, 395 F.2d 976, 981-82 (5th Cir. 1968)). If the expert provides no advice or acts as a co-conspirator and not as an expert, good faith reliance is not established. Johnson, 730 F.2d at 686; United States v. Miles, 290 F.3d 1341, 1354 (11th Cir. 2002) (per curiam). A reliance instruction is also not required if the defendant failed to disclose "material facts related to [the defendant's] misrepresentations."[42] United States v. Condon, 132 F.3d 653, 657 (11th Cir. 1998) (per curiam).

The defendant bears an "extremely low" threshold to justify the good faith reliance instruction and does not need to prove good faith. Ruiz, 59 F.3d at 1154; see also Morris, 20 F.3d at 1114 n.2. Whether the defendant fully disclosed the relevant facts, failed to disclose all relevant facts, or concealed information from his advisor, and relied in good faith on his advisor are matters for the jury–and not

---

[42] A taxpayer who fails to disclose material information from his accountants or takes affirmative steps to mislead his accountants is not entitled to argue reliance. United States v. Lisowski, 504 F.2d 1268, 1272 (7th Cir. 1974).

the court–to determine, under proper instruction.[43]  See United States v. Baldwin, 307 F.2d 577, 579 (7th Cir. 1962); United States v. Walters, 913 F.2d 388, 392 (7th Cir. 1990).  A jury is entitled to the opportunity to believe or disbelieve even fragile evidence in support of a defense.  Strauss, 376 F.2d at 419; Eisenstein, 731 F.2d at 1545.  Defendants are entitled to the good faith defense instruction if it

> (1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense[,]

and where there is any evidence, regardless of how dubious, inconsistent or weak it may have been, to support their good faith claim.  Morris, 20 F.3d at 1116 (punctuation and citation omitted).  The instruction is appropriate even where the evidence might lead the jury to conclusions that would not benefit the defendant because refusing the charge withdraws the point from the jury's consideration and a jury should be given the opportunity to resolve all questions of fact.  United States v. Platt, 435 F.2d 789, 792-93 (2nd Cir. 1970).  Such an instruction was proper where the defendants' books were kept internally and reviewed by outside

---

[43]  The trial court's evaluation of the evidence supporting a reliance defense and denial of such a charge "dilutes" the defendants' trial and acts as an "impermissible" directed verdict against the defendants.  Bursten, 395 F.2d at 981 (quotation marks and citation omitted).

accountants, and their tax returns were prepared by outside accountants,[44] see

Morris, 120 F.3d at 1114, where the only evidence in support of the instruction is

the defendant's own testimony, see Strauss, 376 F.2d at 419 (citing Tatum v.

United States, 190 F.2d 612, 617 (D.C. Cir. 1951), and where the defendant failed

to testify, see Lindo, 18 F.3d at 356. The reliance instruction is also proper even if

the outside accountant was a co-defendant. United States v. Duncan, 850 F.2d

1104, 1105, 1117 (6th Cir. 1988), overruled on other grounds, Schad v. Arizona,

501 U.S. 624, 111 S. Ct. 2491 (1991). The denial of the instruction may prejudice

the defendants where they have contested that they lacked the specific intent to

commit tax fraud; such prejudice is "amplified" when the evidence against them

was circumstantial and limited, and the evidence in their favor was substantial.[45]

---

[44] The good faith reliance instruction was proper when the defendant: (1) had been advised by an accountant that extensions had been requested, Platt, 435 F.2d at 790-92; (2) was merely a "'walk-in customer'" who provided only oral information rather than a regular customer whose business activity was continuously overseen by an accountant, United States v. Kim, 884 F.2d 189, 193-94 (5th Cir. 1989); (3) had signed a tax return prepared by an accountant from records recorded by the defendant's bookkeeper, Berkovitz v. United States, 213 F.2d 468, 470, 472-73, 476 (5th Cir. 1954); and (4) had signed tax returns prepared by an accountant from records in which entries were classified by the bookkeeper and the defendant neither concealed anything nor refused the accountant any information, United States v. Pechenik, 236 F.2d 844, 845-47 (3rd Cir. 1956) (a jury was entitled to accept or reject evidence that the defendant relied on his bookkeeper to determine how various expenses should be entered into his books and on his accountant to audit the corporation's books and prepare its tax returns). See also United States v. Head, 641 F.2d 174, 180 (4th Cir. 1981) (such an instruction was proper where the defendant "relied upon accountants to prepare tax returns and did nothing to obstruct the flow of information necessary to prepare those returns").

[45] The prejudice from a district court's failure to give the good faith reliance instruction is not abated by counsel's presentation of the theory of defense during closing argument. With

Morris, 20 F.3d at 1118. The instruction may be properly denied, however, if: (1) there is evidence that the defendant personally failed to record receipts, provide his accountant with the underlying records, or inform his accountants of additional income, see United States v. Garavaglia, 566 F.2d 1056, 1059-60 (6th Cir. 1977); (2) there is no evidence that the defendant sought, received, or followed the advice of an advisor in good faith or informed the advisor of all of the facts, see United States v. Brimberry, 961 F.2d 1286, 1290 (7th Cir. 1992); United States v. Durnin, 632 F.2d 1297, 1301 (5th Cir. 1980); (3) such theory of defense is based merely upon speculation, see Condon, 132 F.3d at 656; or (4) the issue of the defendant's reliance on advice for given conduct is not before the jury on the charges of conviction, United States v. Snipes, __ F.3d __, __, 2010 WL 2794190 at *9 (11th Cir. July 16, 2010). The reliance instruction is also not necessary where the district court's instructions regarding the defendant's honest, good faith belief that his actions were legitimate negates the specific intent required for conviction, United States v. Tannehill, 49 F.3d 1049, 1058 (5th Cir. 1995), adequately covered the substance of the defendant's theory of defense and permitted defense counsel to present adequate argument on the defendant's good faith misunderstanding of the law, Snipes, __ F.3d at __, 2010 WL 2794190 at *10; United States v. Kouba, 822

no instruction on the legal effect of good faith reliance, a jury is left with no lawful or legitimate alternative for the explanation for the defendant's conduct. See Ruiz, 59 F.3d at 1155.

61

F.2d 768, 771 (8th Cir. 1987), or required that the jury rule out good faith in order to convict the defendant. United States v. Martinelli, 454 F.3d 1300, 1316 (11th Cir. 2006).

The requested good faith reliance jury instruction was based on our pattern jury instructions and was, therefore, a correct statement of the law.[46]

We must first determine whether Kottwitz and the Marchellettas preserved the issue of the good faith reliance instruction through their objection in the district court. The good faith defense theory was presented throughout the trial. The theory was set out in the opening statements, during Schwartz's cross-examination, and in closing arguments that Kottwitz, Junior, and Senior, none of whom were trained or experienced in taxes, relied on Schwartz for his advice in classifying entries made in Circle's books and in preparing correct tax returns. They specifically requested the instruction and objected both orally and in writing to the district court's refusal to grant the instruction before jury deliberations commenced. We, therefore, review the district court's refusal to give the instruction for abuse of discretion.

---

[46] The additions to the pattern jury instructions included language consistent with the regulations under the Internal Revenue Code. "The tax return preparer must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete . . . [and] to determine the existence of facts and circumstances required by a Code section or regulation as a condition of the claiming of a deduction or credit." 26 C.F.R. § 1.6694-1(e).

Whether it was necessary to provide the good faith reliance instruction depends on whether (1) a juror could find any evidence to conclude that Kottwitz and the Marchellettas provided all material facts to their accountant, and (2) a juror could find any evidence that Kottwitz and the Marchellettas relied in good faith on that accountant's advice and decisions. The evidence demonstrated that the Marchellettas hired Schwartz to prepare Circle's audited financial statements and tax returns, and that Kottwitz worked closely with him during his yearly audits. In a letter dated 21 August 2001, Junior confirmed to Schwartz that he had "to the best of my knowledge and belief . . . made available to you all . . . [f]inancial records and related data [and] [m]inutes of the meetings of stockholders, directors . . . ." Govt. Ex. 427.10. Schwartz explained that he conducted the audits but relied on Kottwitz for "mostly everything" because neither Junior nor Senior wanted to be involved or provided him with clear answers regarding "the technicalities of the books and records." R22 at 185-86. He stated that Senior would walk through but did not participate and did not seem to care about the numbers. Id. at 185-87. Kottwitz did not limit Schwartz's audit in any manner, provided him with requested documentation, and relied on his accounting advice to insure the propriety of Circle's accounting. Schwartz testified that Kottwitz made her best efforts to assure that Circle's accounting was correct and to make appropriate

63

changes. Logan and Diggs both testified that Schwartz was given access to Circle's books and records and to any other requested documents, and that he directed the correction of misclassified entries. Schwartz admitted that neither the time that he spent on the audit nor his access to the documents was limited, and made no changes to the time that he allocated after he found it "difficult" to perform the audit in two days. Schwartz not only reclassified the monies Circle received from Nastasi as a loan, but he failed to inform Senior of the reclassification or its effect on his previously filed tax return and took no steps to correct that tax return. Schwartz admitted reviewing the JM reports, which included the Crabapple and Newport Bay costs of, respectively, about $1 million and $800,000, and reflected no income.

Based on this evidence, the Marchellettas were entitled to have the jury instructed on their good faith reliance on Schwartz's advice and on Schwartz's failure to exercise due care. The requested instruction properly placed the determination with the jury as to whether they acted in good faith in seeking advice, fully and completely reporting to their accountant, and acting strictly in accordance with the advice. The district court's refusal to deliver the requested instruction, which addressed the defense's theory of the case on Counts Three, Four, and Five was not substantially covered by other instructions seriously

impaired Kottwitz and the Marchellettas' defense. The district court's refusal to

deliver the requested instruction did not, however, impair Kottwitz and the

Marchellettas' defense as to the conspiracy charge (Count One). The defense's

theory of the case as to the conspiracy charge was fully encompassed by the good

faith instruction given by the district court because the conspiracy was

consummated before any reliance upon the advice of an accountant.

Before we resolve this issue, however, we must look again to our review of

the sufficiency of the evidence as the counts in question because "[o]nly if the

evidence is sufficient for a properly instructed jury to have convicted [the

defendants of the charged offenses] do we have to determine whether the district

court's erroneous jury instruction constituted . . . error requiring reversal and

remand for a new trial." United States v. Mount, 161 F.3d 675, 678 (11th Cir.

1998) (citation omitted). "If the record does not contain sufficient evidence under

which a properly instructed jury could have convicted [the defendants of the

charged offenses], then double jeopardy principles mandate that we vacate the

conviction and remand to the district court with directions to enter a judgment of

acquittal on the count in question." Id. (quotation marks and citation omitted).

Because we have determined that the evidence was sufficient to support

Junior's and Senior's convictions for filing materially false personal income tax

returns for 2000 (Counts Three and Four), and Senior's conviction for evading taxes (Count Five), we reverse their convictions on these counts and remand for a new trial. Because the evidence was, however, insufficient to support Kottwitz's, Junior's, and Senior's convictions for aiding and assisting in the filing of a materially false corporate return for 2001 (Count Six), we need not address whether the district court's instruction would have constituted plain error requiring a new trial if the evidence had been sufficient. See Mount, 161 F.3d at 680 n.4. We reverse their convictions on this count and remand with directions to enter a judgment of acquittal on this count and for resentencing for Kottwitz.[47]

### III. CONCLUSION

For the reason stated above, we AFFIRM Kottwitz's, Junior's, and Senior's convictions for conspiracy to defraud the Internal Revenue Service (Count One). We VACATE Junior's and Senior's convictions for filing materially false personal income tax returns for 2000 (Counts Three and Four), and Senior's conviction for evading taxes (Count Five), and REMAND for a new trial. We REVERSE Kottwitz's, Junior's, and Senior's convictions for aiding and assisting in the filing of a materially false corporate return for 2001 (Count Six) and REMAND with

---

[47] Kottwitz did not appeal her sentence and the record of her sentencing is not before us. We note, however, that because the sentencing on multiple counts may reflect interdependence of the counts of conviction, resentencing is appropriate. See United States v. Watkins, 147 F.3d 1294, 1296 n.3, 1297 (11th Cir. 1998).

directions to enter a judgment of acquittal on this count and for resentencing of

Kottwitz on Count One.

BIRCH, Circuit Judge, concurring in part and dissenting in part:

I fully concur with the majority's analysis of and ruling on the district court's failure to properly charge the jury. With regard to the majority's conclusion that the record reflects adequate evidence to sustain the prosecution's burden on the conspiracy charges, I respectfully dissent.

Mindful of the prosecution's burden to prove guilt beyond a reasonable doubt, a review of the record manifests that there was no direct or circumstantial evidence presented that Kottwitz and the Marchellettas conspired to impede the IRS. There was no evidence that showed that Kottwitz knew how the Marchellettas would treat any of the Circle expenses which benefitted them personally on their tax returns, had any in put in the preparation of their tax returns, or ever saw their tax returns. There was no evidence presented showing that Kottwitz ever even saw the Consulting Agreement or the Payment Guarantee between Senior and Nastasi & Associates, had any direct knowledge of the terms of those documents, or had any information as to their tax treatment. As Senior maintains, the documents – and the IRS's acceptance of Circle's taxes on the first three months' payments of the $6,000 consulting fees – support a conclusion that the payments were income to Circle and not to Senior. The written consulting

68

agreement provided that Nastasi was retaining the services of Senior and Circle, and Nastasi's IT people consulted with Circle's IT people. Senior was a salaried employee of Circle and paid income taxes based on a W-2 that he received from Circle. The Nastasi monies were reclassified by Schwartz so as not to be recognizable as taxable income to Circle and Schwartz failed to inform Senior of the adjustment or to advise him that his 2000 tax returns needed to be amended to reflect the adjustment. There was no evidence that (1) Kottwitz directed the readjustment of Senior's payments as taxable income to Senior, (2) attempted to cover up the original classification of the payments, or (3) Senior knew of the readjustment of these payments. There was no evidence presented that either Junior or Senior directed any account entries into Circle's accounts. The construction costs for Crabapple and Newport Bay were set up as separate accounts in Circle's books, and all expenses were tracked within those accounts. There was no evidence that Kottwitz made any decisions regarding the Newport Bay property or how it was, or was not, treated on Circle's books or by Senior. There was no evidence that Kottwitz ever saw Circle's tax returns or had any input other than providing documentation for Schwartz. There was no evidence that Kottwitz had any involvement in the preparation, execution or submission of Junior's or

Senior's tax returns or knew how Circle's payments for the home construction and other expenses were treated in Junior and Senior's personal tax returns.

There was no evidence that suggests that Kottwitz or the Marchellettas knew that Circle would file a false 2001 tax return. Kottwitz and the Marchellettas never saw the tax return before it was filed or took any action in preparation of it with an expectation that it would be filed with materially false statements.

Moreover, the personal expense entries in Circle's books could not have been characterized as dividends or balanced in relation to Junior's and Senior's shareholder interests until the end of Circle's accounting year. The determination of these expenses from 1 April 2000 until 31 March 2001 as taxable income could also not occur until the end of Circle's fiscal year, after 31 March 2001, and the adjusted entries were made in September 2001. At that time, the Marchellettas recognized their constructive income and paid their respective taxes. Those determinations could not be made for the 2000 tax year. The conspiracy convictions should be reversed.

Because the government did not show that Kottwitz or the Marchellettas knew of a tax conspiracy or that Kottwitz or the Marchellettas voluntarily and knowingly agreed to impede the IRS's collection of taxes, it failed on its burden of proof with respect to the convictions on Count One.